UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHNNY CASSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-30036-KAR |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
COMMISSIONER'S DECISION
(Docket Nos. 14 & 16)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Johnny Casso ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a final decision of the Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI

of the Act, 42 U.S.C. § 1381 *et seq.*  Plaintiff applied for DIB and SSI on June 20, 2016 alleging

a July 15, 2015 onset of disability due to Post Traumatic Stress Disorder ("PTSD"), "deep

depression," anxiety, obsessive compulsive disorder ("OCD"), and bipolar disorder

(Administrative Record "A.R." at 67-68, 87, 88).  After a hearing, the Administrative Law Judge

("ALJ") found that Plaintiff was not disabled from July 15, 2015 through September 5, 2018, the

date of the decision, and denied his application for DIB and SSI (A.R. at 12-27).  The Appeals

Council denied review on January 29, 2019 (A.R. at 1-5) and, thus, Plaintiff is entitled to judicial review.  *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff seeks remand or reversal based on his claims that the ALJ erred by failing to explain her failure to adopt portions of an expert's opinion that the ALJ afforded the "greatest weight," failing to properly evaluate Plaintiff's treatment providers' medical opinion evidence, failing to afford sufficient weight to Plaintiff's statements concerning the severity of his symptoms, and failing to reconcile conflicts between the testimony of the Vocational Expert ("VE") and the *Dictionary of Occupational Titles* ("DOT").  Pending before this court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 14), and the Commissioner's motion for an order affirming his decision (Dkt. No. 16).  The parties have consented to this court's jurisdiction (Dkt. No. 8).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons discussed below, the court grants Plaintiff's motion, denies the Commissioner's motion, and remands the case for further proceedings consistent with this memorandum and order.

II.   FACTUAL BACKGROUND

A.   Plaintiff's Educational Background and Work History

Plaintiff was forty-one years old on the alleged onset date (A.R. at 23).  He had obtained a GED (A.R. at 51).  In July 2015, he left his job as a cook at a local restaurant to travel to California to be with his mother who had undergone a mastectomy (A.R. at 67, 205-06, 396).  He claimed that his mental health condition prevented him from returning to work thereafter (A.R. at 44).

B.   Mental Health Records from the Brien Center and Treatment Records from CHP Adams Internists

On March 20, 2016, Plaintiff presented at the Berkshire Medical Center Emergency Department reporting that he was "drinking pretty regularly and pretty heavily" after he attended

his best friend's funeral in California (A.R. at 365).  He was diagnosed with depression and advised to follow up with the Brien Center for treatment (A.R. at 365-66, 370).

On April 5, 2016, LICSW Nancy Banfield of the Brien Center conducted a comprehensive assessment of Plaintiff (A.R. at 300-13).  Ms. Banfield described Plaintiff's "ordered" thoughts and "clear and logical" speech (A.R. at 308).  With the exception of Plaintiff's self-reported mood as being "depressed" and "'numb,'" and his emotional state-affect as being "sad [and] tearful," his mental status exam, including his behavior, speech, perception, thought content, thought process, cognitive functioning, orientation, memory, and insight were within normal limits (A.R. at 304-05).  He was diagnosed with PTSD (A.R. at 310).

The April 29, 2016 Brien Center record shows that Plaintiff was anxious and depressed (A.R. at 317).  He reported "sudden nightmares, intrusive thoughts and symptoms related to hyperarousal . . . ." (A.R. at 318).  He was diagnosed with PTSD, unspecified depressive disorder, rule out unspecified bipolar disorder, and alcohol use, cocaine use, and cannabis use disorders in remission (A.R. 318).  PA-C Christopher Biernacki prescribed melatonin and Diphenhist for sleep and Prozac for depression and anxiety (A.R. at 314, 318).

On June 15, 2016, Mr. Biernacki described Plaintiff's mood as dysphoric (A.R. at 324).[1] Otherwise, his mental status examination was within normal limits (A.R. at 324).  On July 13 and 22, 2016, Plaintiff reported that medications, including Lexapro and Risperdal, which replaced Prozac, had improved his sleep and mood (A.R. at 321, 323).  Plaintiff's July 22, 2016

---

[1] "Dysphoria" is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort."  *dysphoria*, STEDMANS MEDICAL DICTIONARY (Nov. 2014).

3

mental status exam was within normal limits except that his mood was dysphoric and his thought process was tangential (A.R. at 321).

The August 16, 2016 Brien Center record included Plaintiff's report that he was going to California the next day because his mother, who had breast cancer, was experiencing complications (A.R. at 422).  Plaintiff indicated that he was still angry and irritable at times, but Risperdal helped (A.R. at 422).  He reported recently retrieving a hatchet from his home when he felt threatened by three men on the street (A.R. at 422).

During Plaintiff's September 30, 2016 visit to the Brien Center, he reported that he had stopped taking Lexapro and Risperdal due to their negative side effects (A.R. at 422).  He was "more worried about anger, and being out of control" than about depression (A.R. at 422).  On November 18, 2016, Plaintiff indicated that he was taking Trileptal (Oxcarbazepine) and his anger was under control (A.R. at 422, 424).  He was "'able to reel it in'" (A.R. at 422).  He had not argued with his girlfriend and had acquired two new puppies, but had experienced crying spells (A.R. at 422).  During Plaintiff's December 12, 2016 visit to his PCP, Benjamin Rudin, M.D. at CHP Adams Internists, Plaintiff reported that he was experiencing angry outbursts and anxiety (A.R. at 495).

On January 13, 2017, Plaintiff reported to Mr. Biernacki that Remeron (Mirtazapine) improved his sleep and mood (A.R. at 422, 424).  On February 10, 2017, Plaintiff indicated that he continued to use cannabis, his sleep and mood had improved, and his anger was under control (A.R. at 422).  He was "[a]ble to push angry feelings aside" (A.R. at 422).  The Brien Center record of March 31, 2017 indicates that Plaintiff's brother died in February (A.R. at 446).

Plaintiff reported that he was able to control his anger (A.R. at 446).[2]  The April 10, 2017 record of Plaintiff's visit to his PCP indicates that Plaintiff had recently started taking Abilify, that Trileptal helped his anger, but he stopped taking it because "it left him feeling emotionless," and he was no longer using Mirtazapine (A.R. at 493).  The April 28, 2017 Brien Center record noted Plaintiff's account of his recent anger outburst that was directed toward a police officer (A.R. at 446).  "Deep breathing helped" him to avoid physical violence (A.R. at 446).  On June 2, 2017, Plaintiff reported to Mr. Biernacki that he lacked energy and motivation and was not taking Abilify daily as prescribed (A.R. at 446).

During Plaintiff's July 19, 2017 visit to the Brien Center, Plaintiff reported the recent deaths of his girlfriend's father, his cousin, and a friend (A.R. at 446).  He was taking Abilify daily, which made "blow ups" less frequent, although he had "blow[n] up" at his girlfriend's sister on the previous day (A.R. at 446).  He was taking Trileptal and sleep medication three to four times per week (A.R. at 446).  His mental status examination on that date indicated that his mood was "dysphoric," his affect was "flat," and his thought process was tangential (A.R. at 446).  Mr. Biernacki's impression was that Plaintiff suffered from PTSD due to childhood physical abuse by his older brother and intermittent explosive disorder (A.R. at 318, 447).[3]

     C.    <u>Opinion Evidence</u>

---

[2] The Brien Center's treatment records and the ALJ indicated that Plaintiff was treated at the Brien Center on January 13, February 10, and March [3]0, 2016 (A.R. at 18, 422, 446). However, "2016" appears to be a typographical error because Plaintiff's initial visit and assessment at the Brien Center was on April 5, 2016 (A.R. at 300).

[3] Intermittent explosive disorder" is "a disorder that may begin in early childhood, or following head injury at any age, characterized by repeated acts of violent, aggressive behavior in otherwise normal persons that is markedly out of proportion to the event that provokes it." *intermittent explosive disorder,* STEDMANS MEDICAL DICTIONARY.

1.      Examining Consultant Teena Guenther, Ph.D.

Teena Guenther, Ph.D. conducted a consultative examination of Plaintiff on November 16, 2016 (A.R. at 395-406).  Dr. Guenther noted that Plaintiff initially presented as "almost overly reserved, but as the interview continued, he certainly became more passionate as he spoke about certain events and situations in his life, in fact acknowledging that he does struggle with anger" (A.R. at 395).  Toward the end of the interview, Plaintiff's voice became louder and he often cursed, but he was otherwise respectful (A.R. at 395).

Plaintiff reported that, as a child, he was a victim of his brother's abuse (A.R. at 404).  He left his most recent job as a cook in a local restaurant to go to California to be with his mother who had undergone a mastectomy (A.R. at 396).  He did not return to work due to underlying symptoms and struggles with anger (A.R. at 396).

Plaintiff described himself as "quick-tempered" if he felt threatened or disrespected (A.R. at 396, 400).  He recounted displays of anger, including a recent incident when he held up a hatchet to threaten an individual who he thought was ridiculing him (A.R. at 396, 400, 404). During another episode the week before the examination, the police responded after he banged on his neighbors' door because they left two notes on his car asking him not to park in a certain space (A.R. at 401-02, 404).  He further stated that he had disagreed with co-workers who said "'stupid stuff'" (A.R. at 396).  Plaintiff said, "'I'm not the person you want to say stupid stuff to'" (A.R. at 396).  He indicated that he had threatened co-workers and walked off the job if he felt frustrated or angry (A.R. at 396, 400).

Plaintiff reported difficulty with concentration and memory (A.R. at 402).  Dr. Guenther found that Plaintiff was "a bit circumstantial and even vague in responding to questions, which sometimes ma[d]e it challenging for [her] to get concise information" (A.R. at 395, 396, 404).

6

At times, Plaintiff was "difficult to follow" (A.R. at 400).  He was able to perform simple calculations and "Serial Threes," spell "world" in reverse, recite six digits forward and four digits backward, and recall three objects immediately and after five minutes (A.R. at 404).

Plaintiff explained that he received psychiatric treatment at the Brien Center (A.R. at 398).  LICSW Nancy Adkin was his therapist and Mr. Biernacki had prescribed Oxcarbazepine (Trileptal) to control Plaintiff's anger (A.R. at 398).  He had been taking that medication for about a month (A.R. at 398).  Plaintiff believed that it offered "some benefit," but he continued to experience underlying anger (A.R. at 398).

Based on Plaintiff's descriptions of his struggles to manage his anger, Dr. Guenther had "significant concerns about his judgment" (A.R. at 404).  She noted that "small situations" had provoked him at times and that he had acted "in ways that ultimately could cause harm to others" (A.R. at 404-05).  Dr. Guenther suspected that "in the workplace he is someone who may struggle to tolerate even more minor stressors or even constructive critiques or criticisms from co-workers or supervisors.  He is someone who may even exhibit some behavioral extremes, for instance, behaviors in the workplace" (A.R. at 406).  Dr. Guenther further found Plaintiff to be "intellectually capable" of following a variety of directions and instructions, but that "he may exhibit some cognitive interference that may be most obvious when he is experiencing emotional distress" (A.R. at 406).

Dr. Guenther noted that "considering the presence of the underlying psychiatric symptoms and suspected maladaptive personality traits, the results of [her] evaluation [were] consistent with [Plaintiff's] allegations" (A.R. at 406).  She diagnosed an unspecified mood disorder without psychotic features, PTSD, provisional, unspecified personality disorder, provisional, and rule out impulse control disorder and alcohol and cannabis use disorder (A.R. at

406).  Dr. Guenther described Plaintiff's prognosis as "guarded" and noted that Plaintiff's

underlying personality disorder traits were "long-standing" (A.R. at 406).

        2.       Mr. Biernacki's and Ms. Adkin's Opinions

     Mr. Biernacki and Ms. Adkin, Plaintiff's therapist, completed forms concerning Plaintiff's

mental impairments and his ability to work (A.R. at 409-14, 428-33, 462-67, 468-73, 511-16).

     In January 2017, Mr. Biernacki diagnosed Plaintiff as having PTSD and an unspecified

depressive disorder due to the recent deaths of his best friend and father, and opined that Plaintiff

was unable to work (A.R. at 409, 411, 413).  Mr. Biernacki indicated that Plaintiff had

"moderate-to-marked" limitations in his ability to understand, remember, and carry out detailed

instructions, perform activities within a schedule, consistently be punctual, and accept

instructions and respond appropriately to criticism from supervisors (A.R. at 412).  In addition,

Mr. Biernacki indicated that Plaintiff's "marked" symptoms would constantly interfere with his

abilities to maintain attention and concentration for extended periods, work in coordination with

or near others without being distracted by them, make simple work-related decisions, complete a

workday without interruptions from psychological symptoms, perform at a consistent pace

without rest periods of unreasonable length or frequency, interact appropriately with the public,

get along with co-workers and peers without distracting them, and maintain socially appropriate

behavior (A.R. at 412).

     Mr. Biernacki's and Ms. Adkin's April 2018 opinions on the Psychiatric/Psychological

Impairment Questionnaire forms generally mirrored each other (A.R. 462-67 (Mr. Biernacki),

468-73 (Ms. Adkin)).  Ms. Adkin and Mr. Biernacki diagnosed Plaintiff with PTSD and

"recurrent, severe" depression (A.R. at 462, 468, 470).  They noted that Plaintiff socially isolated

and that his interactions with others could trigger "intense anger" (A.R. at 464, 470).  According

to Ms. Adkin and Mr. Biernacki, Plaintiff's symptoms would constantly interfere with his abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or near others without being distracted by them, complete a workday without interruptions from psychological symptoms, perform at a consistent pace without rest periods of unreasonable length or frequency, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, respond appropriately to workplace changes, and set realistic goals (A.R. at 465, 471). They opined that Plaintiff would likely be absent from work more than three times per month as a result of his impairments (A.R. at 466, 472).

3.      The State Agency Consultants' Opinions

On November 22, 2016, Kenneth Higgins, Ph.D., assessed Plaintiff's mental RFC based on a review of his records including the report of Dr. Guenther's consultative examination (A.R. at 68, 72). Dr. Higgins opined that although Plaintiff had no understanding and memory limitations, he was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (A.R. at 73, 74). He "may have periodic disruption of sustained task completion due to affective interference, but cognitive [functioning] is otherwise intact" (A.R. at 74). As to Plaintiff's social interaction, Dr. Higgins found moderate limitations in Plaintiff's ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes (A.R. at 74). Dr. Higgins explained that Plaintiff had a history of "mood dysregulation and interpersonal conflict, but also ha[d] the capacity for adequate self-control in structured settings"

(A.R. at 74).  Dr. Higgins further opined that Plaintiff was able to adapt to minor changes in routine (A.R. at 74).  Dr. Higgins determined that Plaintiff was not disabled (A.R. at 76).  The assessment of Lawrence Fieman, Ed.D., offered on March 22, 2017 on reconsideration, mirrored Dr. Higgins' assessment (A.R. at 89-99).

        D.      <u>The ALJ Hearing</u>

               1.      Plaintiff's Testimony

Plaintiff testified that although he had worked as a cook, he presently was unable to work because of his mental condition that was precipitated by the deaths of six family members and close friends, including his father and brother, who died within a relatively short time (A.R. at 36-37, 44-45).  After several deaths, his treatment providers told him that he was not able to work (A.R. at 45).

Plaintiff recounted the incidents when the police were called after he pounded on his neighbors' apartment door and when he hit someone in the chest with the butt of a hatchet after that person ridiculed him (A.R. at 45-46).  Plaintiff indicated that he was not ready to work, especially in a job in which he would have access to "knives, frying pans, hot oil, and . . . such" (A.R. at 45-46).

Plaintiff had lived with a roommate but moved in with his girlfriend after his therapist suggested the change (A.R. at 46-47).  He had been staying with his girlfriend for about eighteen months as of the hearing date (A.R. at 47).  He attempted to avoid other people as much as possible because of his PTSD and "impulsive explosive disorder" (A.R. at 47-48, 56).  He testified that he did not want to hurt anyone (A.R. at 57).  Although he sometimes drove to town in the morning to run his dogs and visit a coffee shop and the supermarket bakery, he would not drive after 10:00 A.M. because it was "too hectic" (A.R. at 48-49, 57).  Plaintiff raised his dogs

from puppies and played with them every day, but his depression prevented him from doing laundry and housework and cooking anything except hot dogs (A.R. at 47, 49, 50, 55). He testified that he cried "uncontrollably" at least once each day for no apparent reason (A.R. at 49, 58). Plaintiff further indicated that the medication he took to help with sleep worked "sometimes," but he experienced four to five nightmares every week (A.R. at 58).

2.      The Vocational Expert's Testimony

In order to elicit the VE's testimony as to whether Plaintiff could perform his past jobs or jobs that existed in the regional and national economy, the ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience who could perform work at all exertional levels, who could understand, remember, and carry out instructions without strict rate, pace, or production requirements throughout an ordinary work day and normal work week with normal breaks on a sustained basis, who could not interact with the general public but could occasionally work in the general vicinity, who could respond to occasional and superficial interaction with co-workers, who could respond appropriately to supervisory directions and feedback in a routine work setting, who could adapt to simple and occasional change, and who could make simple and occasional decisions in a routine work setting (A.R. at 61-62). The VE opined that the hypothetical person could perform the unskilled jobs of a hand packager, a cleaner, and a laundry worker (A.R. at 62-63). Those jobs could also be performed by a person who could follow simple instructions performed without strict rate, pace, or production requirements as previously described and who could have no contact with the general public (A.R. at 63). However, there were no jobs in the national economy for an individual who was absent twice a month or who was off task for an additional hour per day (A.R. at 64).

III.      THE COMMISSIONER'S DECISION

11

A.    <u>The Legal Standard for Entitlement to DIB and SSI</u>

In order to qualify for DIB or SSI, a claimant must demonstrate that he is disabled within the meaning of the Act. A claimant is disabled for purposes of DIB and SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when he

> is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).[4] The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also*

---

[4] Because the administrative regulations applicable to Title II DIB, which are found in 20 C.F.R. Part 404, and the regulations applicable to Title XVI SSI, which are found in 20 C.F.R. Part 416, are the same in all relevant respects, for simplicity herein, the Title II regulations in Part 404 will be cited for both.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's Residual Functional Capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate his or her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of July 15, 2015 (A.R. at 15).  *See* 20 C.F.R. § 404.1571 *et*

*seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments:  PTSD, depression/bipolar disorder, an anxiety disorder, OCD, a personality disorder, and polysubstance dependence (alcohol, cocaine, and cannabis) (A.R. at 15).  *See* 20 C.F.R. § 404.1520(c).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that his impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 15-16).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  In assessing the so-called "paragraph B" criteria, the ALJ determined that Plaintiff had moderate limitations in (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself (A.R. at 15-16).[5]

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether he could perform past relevant work, and, if the analysis continued to step five, to determine if he could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with nonexertional limitations.

> [He] can understand, remember and carry out simple instructions without strict rate, pace or production requirements.  He cannot tolerate contact with the general public.  He can respond appropriately to occasional and superficial interaction with coworkers.  He can respond appropriately to supervisory directions and supervisory feedback in the routine work setting.  He can adapt to simple and occasional change and make simple and occasional decisions in the routine work setting.

---

[5] To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in the following broad areas of mental functioning:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  20 C.F.R. § 404.1520a(c)(3).  "[T]he limitations identified in the 'paragraph B' criteria and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."   SSR 96-8p, 1996 WL 374184, at *4.

(A.R. at 17).  At step four, the ALJ found that Plaintiff would not have been able to perform his past relevant work through the date last insured (A.R. at 23).  *See* 20 C.F.R. § 404.1565.  However, considering Plaintiff's age, education, work experience, and RFC, based on the VE's testimony, the ALJ found that Plaintiff could perform the unskilled jobs of a hand packager, a cleaner, and a laundry worker (A.R. at 23-24).  *See* 20 C.F.R. §§ 404.1569, 404.1569(a).  Consequently, on September 5, 2018, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, at any time from July 15, 2015, the alleged onset date, through the date of the decision (A.R. at 25-26).  *See* 20 C.F.R. § 404.1520(g).

IV.   STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

     V.     A NALYSIS

     A.     <u>The RFC Determination was not Supported by Substantial Evidence</u>

     Plaintiff argues that the RFC was not supported by substantial evidence because the ALJ afforded Dr. Guenther's opinion concerning Plaintiff's limitations the "greatest weight," but, without explanation, failed to adopt Dr. Guenther's opinion concerning Plaintiff's limited ability to interact with his supervisors (Dkt. No. 15 at 13).  The court agrees with Plaintiff that the absence of such an explanation constitutes a legal error that requires remand.

     "The RFC assessment must always consider and address medical source opinions."  SSR 96-8p, 1996 WL 374184, at *7.  An ALJ "must adequately explain [her] treatment of [an] opinion so that a reviewer can determine if the decision is supported by substantial evidence." *Taylor v. Astrue*, 899 F. Supp. 2d 83, 88-89 (D. Mass. 2012).  *See* 20 C.F.R. § 404.1527(f)(2); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (the ALJ "must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 . . . providing appropriate explanations for accepting or rejecting such opinions.").  "If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7.  "'[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on a [specific] functional capacity' because 'the ALJ, not a physician, is charged with determining a claimant's

RFC from the medical record.'" *Bennett v. Berryhill*, 1:16-cv-00399-LF, 2017 WL 5612154, at *3 (D.N.M. Nov. 21, 2017) (alterations in original) (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted)).  Nonetheless, "[a]n ALJ is a lay person who is generally unqualified to interpret 'raw, technical medical data[]' *Berrios* [*v. Sec. of Health & Human Servs.*], 796 F.2d [574,] 576 [(1st Cir. 1986),] [so] . . . an ALJ generally needs a medical expert to translate medical evidence into functional terms."  *Rosa-Figueroa v. Comm'r of Soc. Sec.*, Civil No. 18-1709 (BJM), 2019 WL 5622593, at *4 (D.P.R. Oct. 30, 2019) (citing *Vega-Valentín v. Astrue*, 725 F. Supp. 2d 264, 271 (D.P.R. 2010)).  Further, an ALJ has a duty to explain how any material inconsistencies or ambiguities in the case record were considered and resolved.  *See* SSR 96-8p, 1996 WL 374184, at *7.

In determining Plaintiff's RFC, the ALJ afforded the "greatest weight" to the opinion of Dr. Guenther, the examining consultant (A.R. at 21).  The ALJ recognized Dr. Guenther's opinion that Plaintiff's insight and judgment were limited and that he "may exhibit some cognitive interference when in emotional distress and he may have some maladaptive personality traits" (A.R. at 21).  The ALJ indicated that she "considered that opinion and provided mental limitations supported by [Dr. Guenther's] findings and evaluation" (A.R. at 21).

Plaintiff points to the omission in the RFC of a restriction that addressed Dr. Guenther's view that "sometimes small situations" provoked Plaintiff's anger and that "in the workplace [Plaintiff] is someone who may struggle to tolerate even more minor stressors or even constructive critiques or criticisms from coworkers or supervisors.  He is someone who may even exhibit some behavioral extremes, for instance behaviors in the workplace" (Dkt. No. 15 at 13; A.R. at 404, 406).  Dr. Guenther rendered her opinion after hearing and crediting Plaintiff's descriptions of incidents that indicated possible serious limitations on his ability to interact

appropriately with co-workers and supervisors, including the occasions when he wielded a hatchet in response to a comparatively minor provocation, when he pounded on his neighbors' door about notes they left on a car, prompting them to summon the police, and when he threatened co-workers and supervisors in the workplace (A.R. at 20, 396, 400, 402, 404, 406). Plaintiff argues that the ALJ's failure to explain why the RFC did not reflect Dr. Guenther's assessment of his limited ability to accept criticism from supervisors constitutes legal error.

"[A]lthough an ALJ need not adopt all or any part of a particular provider's report, [s]he must state [her] reasons for adopting only a portion of it." *Kenerson v. Astrue,* No. 10-CV-161-SM, 2011 WL 1981609, at *5 n.7 (D.N.H. May 20, 2011). *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected."); *Watkins v. Berryhill,* Civil Action No. 3:16-cv-30117-KAR, 2017 WL 4365158, at *11 (D. Mass. Sept. 29, 2017) (the ALJ's failure to explain the basis for omitting from the RFC some of the impairments identified by the DDS experts and the consultative examiner constituted error warranting remand). Without such an explanation, the court does not have a sufficient basis for meaningful review. *See Taylor,* 899 F. Supp. 2d at 88-89; *Snow v. Astrue,* No. 10-cv-609-SM, 2011 WL 4828656, at *4 (D.N.H. Oct. 12, 2011).

Notwithstanding the ALJ's representation that the RFC reflected Dr. Guenther's opinion, the ALJ neither adopted Dr. Guenther's view of Plaintiff's limited ability to respond to instructions and assessments from supervisors nor explained why she rejected it (A.R. at 21). According to the SSA's regulations, for a claimant with a mental impairment, the areas of mental functioning that must be addressed with reference to an individual's ability to interact with others include:

> *the abilities to relate to and work with supervisors, co-workers, and the public.*
> Examples include: cooperating with others; asking for help when needed;

> handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. [The SSA] do[es] not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(2) (emphasis added). *See Bennett,* 2017 WL 5612154, at *7 ("A claimant's ability to interact with supervisors is a work-related mental ability that is critical to all work, and the ALJ must adequately address it in the RFC."); *see also Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 770 (1st Cir. 1991) (per curiam) (to be considered mentally capable of any work, a claimant must be able to cope with certain demands including "the ability to accept supervision"). Although the ALJ was not required to accept all of Dr. Guenther's conclusions, the ALJ was required to explain the conflict between the RFC and Dr. Guenther's serious concerns about Plaintiff's ability to interact appropriately with supervisors. Without such an explanation, the court cannot find that the RFC is supported by substantial evidence. *See Snow,* 2011 WL 4828656, at *4.

The Commissioner makes two arguments in support of his position that the ALJ's decision is adequately supported. First, relying on *Sheldon v. Colvin,* Civil No. 2:13-cv-315-DBH, 2014 WL 3533376, at *5 (D. Me. July 15, 2014), the Commissioner argues that Dr. Guenther's statements about Plaintiff's struggles to accept criticism from co-workers and supervisors and to contain his "behavioral extremes," which employ "qualifiers such as 'may,' . . . do[] not translate 'difficulties' into specific limitations," and, therefore, were not RFC opinions that the ALJ was required to weigh (Dkt. No. 17 at 13-14). Although qualifiers "do not always translate actual or expected difficulties into specific limitations," *Sheldon,* 2014 WL 3533376, at *5, here, the ALJ accepted Dr. Guenther's opinions concerning Plaintiff's limitations in

interacting with the public and with co-workers by including them in the RFC but, without explanation, rejected Dr. Guenther's opinion concerning Plaintiff's limitation in accepting instructions and responding appropriately to criticism from supervisors (A.R. at 17, 21, 404, 406). Dr. Guenther may have employed some qualifiers, but her views about Plaintiff's difficulties in interacting with others and the risk of misbehavior in the workplace were clearly expressed.

Alternatively, the Commissioner claims that the RFC was based on the opinions of the state agency consultants whose opinions the ALJ afforded "great weight" (Dkt. No. 17 at 14-15). Although the RFC was consistent with the state agency consultants' opinions that Plaintiff had moderate limitations in his ability to interact with the general public and with co-workers, in omitting any limitation on Plaintiff's interaction with supervisors, the RFC was inconsistent with the state agency consultants' opinions that Plaintiff had moderate limitations in his abilities to accept instructions and respond appropriately to criticism from supervisors (A.R. at 17, 74). *See Coleman v. Colvin,* Civil Action No. 15-622, 2016 WL 5468151, at *3 (W.D. Pa. Sept. 29, 2016) (state agency nonexamining consultant's opinion that the plaintiff had moderate social interaction limitations with regard to supervisors was inconsistent with the RFC that did not mention such limitations). Because there was no expert opinion in the record that supported the absence of a limitation on Plaintiff's ability to interact appropriately with supervisors, the ALJ, in effect, impermissibly substituted her lay opinion for those of the medical experts. *See Nguyen*, 172 F.3d at 35 ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion."); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) ("With a few exceptions . . . an ALJ, as a lay person, is not qualified to interpret raw data in a medical record."); *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85 (D. Mass.

2018) ("an ALJ may not simply disregard relevant evidence, particularly when that evidence

bolsters the claimant's entitlement to benefits.").

      To the extent the ALJ viewed Drs. Higgins' and Fieman's observations that Plaintiff had a

history of "mood dysregulation and interpersonal conflict, but also ha[d] the capacity for

adequate self-control in structured settings" as supporting the RFC's lack of a limitation on

Plaintiff's interaction with supervisors, and the Commissioner does not specifically argue that it

does, those opinions materially conflict with Dr. Guenther's view that Plaintiff might act on any

animosity he felt toward his supervisors (A.R. at 74, 404, 406).  Although it is the province of

the ALJ to resolve conflicts in the evidence, *see Irlanda Ortiz*, 955 F.2d at 769, the ALJ is

required to explain how material inconsistencies were resolved.  *See* SSR 96-8p, 1996 WL

374184, at *7; *see also Snow,* 2011 WL 4828656, at *5.  The ALJ provided no such explanation

in this case.

      As the basis for affording the state agency consultants' opinions "great weight," the ALJ

relied on Plaintiff's Brien Center treatment records that allegedly documented Plaintiff's "mostly

normal" mental status examinations and symptom relief from medication (A.R. at 21-23).  If the

ALJ intended this evidence to explain her reconciliation of the conflict between the RC and the

opinion evidence concerning Plaintiff's ability to interact appropriately with supervisors, it does

not withstand scrutiny.  The mental status examinations, which reflected Plaintiff's depression,

sad, tearful, and blunted emotional state, anxiety, and "tangential" thought process, do not

support the ALJ's finding that they were "mostly normal" (A.R. at 304-05, 317, 321, 324, 422,

446).  *See Coulombe v. Colvin,* C.A. No. 14-491ML, 2016 WL 1068875, at *11 (D.R.I. Feb. 19,

2016) (claimant's mental status examinations contained "abnormal clinical observations"

including "'up and down mood,'" "tangential thought process," and "constricted affect with

frequent tearfulness").  As to Plaintiff's medication, although the ALJ noted that psychotropic medication improved Plaintiff's "mood and sleep," she ignored the Brien Center's treatment records showing that the prescribed medications often did not adequately control Plaintiff's temper (A.R. at 19, 23, 321, 422, 423, 446 [Abilify made "blow-ups less frequent"], 447).  For example, on April 28, 2017, Plaintiff reported his "angry and verbal" "outburst" toward authority figures, the police (A.R. at 446).

Plaintiff's activities of daily living, upon which the ALJ relied in crafting the RFC, also do not support the omission of a limitation on Plaintiff's interaction with supervisors (A.R. at 16, 21, 23).  The ALJ pointed to Plaintiff's ability to travel to California to care for his mother, have a relationship with his long-time girlfriend and stay at her home, maintain a separate apartment with a roommate, drive to town and visit a coffee shop "on a regular basis," and raise and care for his two dogs (A.R. at 16, 23).  Plaintiff performed most of those activities in isolation and the record is devoid of details concerning the nature of Plaintiff's relationships with his mother, girlfriend, and roommate.  Thus, these activities of daily living are not evidence sufficient to support the absence of a limitation in the RFC on interactions with supervisors.

Any inconsistency between Dr. Gunther's opinion and the state agency consultants' opinions was material because "its resolution could 'reasonably' be expected to affect the final outcome."  *Snow,* 2011 WL 4828656, at *5 (quoting *Poland v. Halter,* No. CIV. 00-350-B, 2001 WL 920038, at *10 (D.N.H. Aug. 2, 2001)).  The hypothetical question that the ALJ posed to the VE did not include a social interaction limitation with regard to supervisors (A.R. at 61-63).  The inclusion of such a limitation could reasonably be expected to change the VE's answer concerning available jobs.  *See Sean M. v. Saul,* No. 1:18-cv-00315-JHR, 2019 WL 4145223, at *3 (D. Me. Aug. 20, 2019) (the responses of a vocational expert are relevant only to the extent

those responses are offered in response to a hypothetical question that corresponds to the medical evidence of record) (citing *Arocho v. Sec'y of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir. 1982)).  Consequently, the ALJ's failure to adequately explain how she resolved any material inconsistencies between the experts' opinions constitutes reversible legal error.  *See Snow,* 2011 WL 4828656, at *5.

For the reasons previously discussed, remand under sentence four of § 405(g) is required. "'Where a court finds that the [Commissioner] has committed a legal or factual error in evaluating a particular claim, the district court's remand order will often include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed.'"  *DaSilva v. Saul,* Civil Action No. 19-cv-12154-ADB, 2020 WL 6743584, at *5 (D. Mass. Nov. 17, 2020) (quoting *Sullivan v. Hudson,* 490 U.S. 877, 885 (1989)).  In addition to faulting the ALJ's treatment of Dr. Guenther's opinion, Plaintiff claimed that the ALJ erred by failing to afford sufficient weight to Mr. Biernacki's and Ms. Adkin's opinions and to correctly assess his testimony concerning the nature and severity of his mental impairments (Dkt. No. 15 at 10-20).  As it stands, the record is insufficient for purposes of evaluating this contention.  First, notwithstanding Mr. Biernacki's April 18, 2018 opinion, which indicates that he last examined Plaintiff on April 13, 2018, there are no Brien Center treatment records after July 2017 (A.R. at 462).  Second, there are no treatment notes from Ms. Adkin, whose April 20, 2018 opinion questionnaire indicated that she began treating Plaintiff on April 1, 2016 and last saw him on April 16, 2018 (A.R. at 446).  "In light of these apparent gaps [in the evidence], the ALJ should not have rejected these treating sources' opinion as unsupported by objective medical evidence, without making further efforts to obtain that missing evidence." *King v. Colvin*, 128 F. Supp. 3d 421, 437 (D. Mass. 2015).  *See Gaeta v. Barnhart*, Civil Action

No. 06–10500–DPW, 2009 WL 2487862, at *5 (D. Mass. Aug. 13, 2009) ("If the evidence does

not support a source's opinion and the ALJ cannot ascertain the basis for the source's opinion, the

ALJ has an obligation to 'make every reasonable effort' to recontact the source for clarification.")

(quoting SSR 96–5p, 1996 WL 374183, at *6).  Accordingly, on remand, the ALJ is directed to

obtain additional evidence concerning Plaintiff's mental impairments in order to complete the

administrative record in accordance with the regulatory standards regarding existing medical

evidence.  *See King,* 128 F. Supp. 3d at 437 (it is the Commissioner's duty to develop an

adequate record "'where there are gaps in the evidence necessary to a reasoned evaluation of the

claim, and where it is within the power of the [ALJ], without undue effort, to see that the gaps

are somewhat filled . . . .'") (quoting *Currier v. Sec'y of Health, Ed. & Welfare,* 612 F.2d 594,

598 (1st Cir. 1980)).  After considering any new evidence, the ALJ is directed to: (1) reevaluate

the RFC and explain the resolution of any conflicts and/or inconsistencies between the medical

opinion evidence and the RFC and between divergent medical opinions; (2) reconsider Mr.

Biernacki's and Ms. Adkin's opinions; and (3) reassess Plaintiff's testimony concerning the

nature and severity of his impairment.[6]

VI.    CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings (Dkt.

No. 14) is GRANTED and the Commissioner's motion to affirm his decision (Dkt. No. 16) is

DENIED.  The matter is remanded to the ALJ for proceedings that are consistent with this

memorandum and order.  The case will be closed.

It is so ordered.

Dated:  November 30, 2020                                        /s/ Katherine A. Robertson

---

[6] In view of the necessity of remand, the court considers it unnecessary to address Plaintiff's
contention that the V.E.'s testimony was not consistent with the DOT.

KATHERINE A. ROBERTSON
U.S. MAGISTRATE JUDGE